UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **HAZEL FALTESEK, et al.,** | § | |
| **Plaintiffs,** | § | |
| | § | |
| | § | **CIVIL ACTION 4:14-CV-01296** |
| **v.** | § | **Jury** |
| | § | |
| | § | **(Hon. David Hittner)** |
| **TASER INTERNATIONAL, INC.** | § | |
| **Defendant.** | § | |

## TASER INTERNATIONAL, INC.'S ANSWER TO PLAINTIFFS' FIRST AMENDED COMPLAINT

Defendant TASER International, Inc. ("TASER" or "Defendant") answers Plaintiffs' First Amended Complaint (Dkt. 14) (the "Complaint"), filed June 27, 2014, as follows. Defendant notes that for the limited purposes of ease of reference only, and not by way of any adoption or admission of any kind, the Complaint's allegations are set forth verbatim, with TASER's Answers following each allegation.

### I.     PARTIES

1.     Plaintiff, HAZEL FALTESEK, Individually and as Representative of the Estate of JOE FRANK FALTESEK, whose address is 526 Donnacorey, Houston, Texas 77013.

**ANSWER:**   TASER lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 1 of the Complaint and, therefore, those allegations are in effect denied in their entirety.

2.     Plaintiff, MARY HEINLEN, as Next Friend of JOEL SEAN FALTESEK, the sole minor child of JOE FRANK FALTESEK.   MARY HEINLEN is the

mother of JSF, whose address is 7500 FM 1459 Rd., Sweeny, Texas 77480.

**ANSWER:**  TASER lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 2 of the Complaint and, therefore, those allegations are in effect denied in their entirety.

3.      Defendant, TASER INTERNATIONAL, INC. is a corporation engaged in interstate commerce designing, manufacturing, and selling conductive energy devices, specifically the TASER Model X26, S/N x00-338321. TASER international sells many of those devices in the State of Texas, and specifically in this case to the Houston Police Department.  TASER INTERNATIONAL, INC. may be served with process by certified mail to its corporate headquarters by serving TASER International, Inc., 17800 N. 85th Street, Scottsdale, Arizona 85255.

**ANSWER:**  TASER admits that it is a Delaware corporation with its principal place of business in Scottsdale, Arizona, and that it can be served with summons to its registered agent.  TASER admits that it designs, manufactures and sells the TASER X26 Conducted Electrical Weapon ("X26 CEW"), and that it has sold its X26 CEW in the State of Texas.  TASER denies the remaining allegations in paragraph 3 of the Complaint and denies liability.

4.      JOE FRANK FALTESEK, now deceased, was a 41 year old male residing at 526 Donnacorey, Houston, Texas 77013.  His estate is represented by HAZEL FALTESEK, Plaintiff.

**ANSWER:**  TASER lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 4 of the Complaint and, therefore, those allegations are in effect denied in their entirety.

## II.      JURISDICTION

5      This court has jurisdiction over this civil action because the amount in controversy, without interest or costs, exceeds the sum or value of $75,000 and the

parties are citizens of different states.  Plaintiffs are residents of the State of Texas, Harris County and Brazoria County, and Defendant is a corporation with its principle place of business in the State of Arizona. 28 U.S.C. § 1332(a)(1).

**ANSWER:**   TASER states that the allegations in Paragraph 5 contain legal conclusions, to which no response is required.   However, to the extent that a response is required, TASER admits the general allegation that this Court has jurisdiction over this case, but TASER denies liability.

## IV.  VENUE

6.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because all or a substantial part of the events or omissions giving rise to the claim occurred in the judicial district.

**ANSWER:**  TASER lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 6 of the Complaint and, therefore, those allegations are in effect denied in their entirety.

## V.  PROCEDURAL HISTORY [alleged]

7.     This matter was initially filed in State District Court in Harris County, Texas.   It was removed to this Court by the Defendant because there is complete diversity of citizenship.   It has causes of action under Texas Civil Practice and Remedies Code, Section 71.002(b), Texas Civil Practice and Remedies Code, Section 71.021, and Texas Civil Practice and Remedies Code, Section 82.005.

**ANSWER:**  TASER admits that this action was initially filed in the State District Court in Harris County, Texas.  TASER admits that it was removed to this Court by TASER because there is a complete diversity of citizenship.  TASER denies Plaintiffs have proper causes of action under Texas Civil Practice and Remedies Code, Section 82.005.  TASER lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in paragraph 7 of the Complaint and, therefore, those allegations are in effect denied in their entirety.

8.     The Defendant TASER International, Inc. ("TASER") filed a Motion to Dismiss all of the causes of action alleged in Plaintiffs' Original Petition, pursuant to Federal Rule of Civil Procedure 12(b)(6) and in the alternative, TASER moved for a more definite statement regarding Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(e).

**ANSWER:** Admit.

9.     This Court denied the motion to dismiss and granted the motion for a more definite statement and so ordered this Amended Complaint.

**ANSWER:** Admit.

## VI.  FACTS SUPPORTING CAUSES OF ACTION [alleged]

10.    In the early afternoon of April 13, 2012, JOE FRANK FALTESEK, hereinafter "Joe" was at his home located at 526 Donnacorey in Houston, Texas 77013.  He shares that residence with his mother, Hazel Faltesek, hereinafter "Hazel", and her husband Johnny Faltesek, hereinafter "Johnny", who were both present for the entire incident.

**ANSWER:**  TASER lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 10 of the Complaint and, therefore, those allegations are in effect denied in their entirety.

11.    Sometime around 3:00 P.M. Hazel called 911 for medical assistance for Joe because she thought he had taken too much of his medication he had been prescribed for bipolar disorder.

**ANSWER:**  TASER lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 11 of the Complaint and, therefore, those allegations are in effect denied in their entirety.

12.    First responders from the Houston Fire Department arrived at the residence and Hazel and Johnny met them in the front yard and discussed the situation with them.  Joe remained in the house had first responders did not attempt to render aid

4

or engage him in any conversation.

**ANSWER:**   TASER lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 12 of the Complaint and, therefore, those allegations are in effect denied in their entirety.

13.   Within a few minutes Houston Fire Department first responders requested that Hazel have Joe come outside, so she opened the front door of the home and called Joe outside. Joe complied and stepped onto the front porch/walk/drive area of the front yard.

**ANSWER:**   TASER lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 13 of the Complaint and, therefore, those allegations are in effect denied in their entirety.

14.   At that time Houston Police Officers immediately intervened.  The moment Joe stepped outside, he was grabbed by the officers, forced to the ground, and shocked by a Conductive Energy Device TASER X26, S/N x00-338321, hereafter TASER Device X26 CEW.  There was never an attempt by the Police Officers or first responders to detain Joe without force or ascertain his physical or mental condition prior to using the X26 CEW.

**ANSWER:**   TASER lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 14 of the Complaint and, therefore, those allegations are in effect denied in their entirety.

15.   Two different methods of deploying the X26 CEW were used on Joe, the dart and wire projectile was fired and the drive stun or contact method, with multiple, at least six (6), applications of electrical charge.  Within minutes Joe began having difficulty breathing and he died in the custody of Houston Police Officers while on route to the hospital.

**ANSWER:**   TASER lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 15 of the Complaint and,

therefore, those allegations are in effect denied in their entirety.

16.    The X26 CEW employed on Joe did not function as a non-lethal device to incapacitate and subdue as it is was designed to do. Instead, this X26 CEW inflicted injuries which caused the death of JOE FRANK FALTESEK.

**ANSWER:**  TASER denies generally and specifically the allegations contained in paragraph 16 of the Complaint and denies liability.

17.    JOE FRANK FALTESEK'S death was caused by one or more of the following wrongful acts of the Defendant, TASER International, Inc.: the product design defect of the X26 CEW; the product warning defect of the X26 CEW; or the product marketing defect of the X26 CEW. TASER International, Inc. is liable to the Plaintiffs for damages according to Texas law. TEX. CIV.PRAC. & REM. CODE §71.002(b), TEX. CIV. PRAC. & REM CODE §71.021, and TEX. CIV. PRAC. & REM. CODE § 82.005.

**ANSWER:**  TASER denies generally and specifically the allegations contained in paragraph 17 of the Complaint and denies liability.

## A.  PRODUCT DESIGN DEFECT [alleged]

18.    The X26 CEW is designed with the ability to operate in two modes. The first mode is the discharge of wire guided probes that embed into the intended target and carry an electrical charge of 50,000 volts to that target. This is the mode in which the target is incapacitated, unable to exercise free will of its muscular control and loses the ability to control its motion. This mode is very effective in subduing the target and usually disables it after one application of charge. This mode provides that most utility of the product and generally completes its intended purpose of subduing the target in a non-lethal manner. The second mode is the drive stun mode, whereby the X26 CEW is placed in direct contract with the target and additional electric impulses are applied. This mode makes the X26 CEW "unreasonable dangerous as designed" because it doesn't subdue the target by

disruption of muscular control like the first mode, it merely causes extreme pain and suffering of the target with the hope of causing enough pain that the target will comply. Many successive applications of charge can be applied without any visible physiological change to the target. The X26 CEW used on Mr. Faltesek was discharges at least 6 times. Multiple times in the second mode, drive stun mode. Unfortunately, both modes have cumulative invisible physiological effects of causing two known conditions which can lead to sudden death. One condition known as excited delirium is often triggered by a target individual being restrained at the same time that multiple X26 CEW charges are being applied. The other condition known to occur is cardiac capture which is a disruption of cardiac rhythm causing cardiac arrest and sudden death. The ability to apply additional charges in drive stun mode is actually unnecessary to the utility of the product since it doesn't actually incapacitate in target in this mode. However, by using the drive stun mode, the risk of sudden death increases substantially by initiating excited delirium. The design of the X26 CEW is such that its utility as a method of incapacitating its target is nearly exclusively vested in its embedded dart mode and the drive stun mode only makes it more dangerous and harmful to its intended target.

**ANSWER:**  TASER admits that its X26 CEW has the ability to operate in two different modes: probe mode and "drive stun" mode.  TASER denies generally and specifically the remaining allegations contained in paragraph 18 of the Complaint and denies liability.

19.   The X26 CEW would be a much safer product and hardly sacrifice any of its utility if it were designed with only the mode of operation that embedded the darts connected by wires to the device. This mode incapacitates its intended target with a single charge and affords the user(s) the chance to subdue the target. The drive stun mode should be eliminated altogether.

**ANSWER:** TASER denies generally and specifically the allegations contained in paragraph 19 of the Complaint and denies liability.

20.     The X26 CEW has no safety mechanisms or design features which limit or separate by extended time interval the number of electrical charges what can be applied in either mode. The best safety feature would be to eliminate the drive stun mode altogether. An alternative safety mechanism would be to limit the drive stun mode to only be used when the wire and dart mode hadn't already been activated. Another alternative safety feature would be to delay the activation of successive charges by a lengthy time delay to avoid quick successive applications of charge which increases the risk of initiating excited delirium or cardiac capture.

**ANSWER:** TASER denies generally and specifically the allegations contained in paragraph 20 of the Complaint and denies liability.

21.     The absence of the foregoing design and safety features was a proximate cause of Mr. Faltesek's death. If the X26 CEW had features which limited the number of charge applications or didn't allow multiple drive stun applications after the wire and dart application of charge had already occurred, then the excited delirium for which the autopsy referred to or the cardiac capture, which the autopsy did not diagnose, but was likely occurring, would never have happened and Mr. Faltesek would in all probability be alive today.

**ANSWER:** TASER denies generally and specifically the allegations contained in paragraph 21 of the Complaint and denies liability.

## B. PRODUCT WARNING DEFECT [alleged]

22.     TASER International, Inc. ("TASER") should have reasonably foreseen the inherent risks to human life that their X26 CEW product posed. It is designed to apply 50,000 volts of electricity to a human target in a manner that would disrupt that humans muscular control to a point where it would be incapacitated and then the device could be used to apply numerous other shocks to that same previously

8

incapacitated human, under the assumption that if the first charge failed one or more successive charges would succeed. The disruption of human neuromuscular signals by electrical shock is known to produce deadly affects to humans. The Defendant is also aware of numerous studies since 2005 that implicate the electrical charges produced by the X26 CEW in possible sudden cardiac distresses such as cardiac capture leading to ventricular fibrillation, especially when the darts are located in close proximity to the chest or heart. Excited delirium is another known risk to X26 CEW induced electrocution and this risk is heightened when the human target is influenced by a drug or medication that might be impairing their normal body function and they are being forcefully restrained. It is reasonable to anticipate that law enforcement of security personnel would use the X26 CEW on individuals in both the wire and dart mode and multiple times in the drive stun mode both drug impaired and non-impaired individuals who are in the process of, or already being restrained. Thus making the risk of sudden death a possibility to humans that are the targets of the X26 CEW resulting from either of its modes of operation.

**ANSWER:** TASER denies generally and specifically the allegations contained in paragraph 22 of the Complaint and denies liability.

23.     TASER failed to provide adequate warnings to the users of the X26 CEW prior to Mr. Faltesek's death with instructions to refrain from direct targeting of the chest or heart region of the body and avoid applying numerous applications of drive stun charges to mentally or physically impaired individuals, especially while being restrained. These warnings should have specifically identified the mentally ill who are likely to be taking medications that could leave them in a condition that is especially vulnerable to numerous applications of electrical charge. These individuals might not be responsive to ordinary request to stop resisting, which tends to lead to a significant number of drive stun charges in a futile and extremely

9

dangerous attempt to get them to submit. These warnings should have stated in part; "Avoid directly targeting the chest area near the heart", "Do not apply multiple charges to the mentally ill", "Do not apply multiple charges to individuals with known cardiac conditions", "Do not continue to apply multiple charges after the individual has fallen to the ground", "Do not continue to apply charges once the target is restrained", "Use of the X26 CEW may cause ventricular fibrillation, cardiac arrest and sudden death". These warnings should also identify the risk of sudden death due to cardiac capture or excited delirium in such a way as to allow police and security force training programs to incorporate avoidance guidelines into their curriculum. Instead, any warnings provided were so general in nature and presented in such a way as to be overlooked as significant by the users of the X26 CEW. These inadequate warnings only furthered the false sense of safety held by it users.

**ANSWER:**  TASER denies generally and specifically the allegations contained in paragraph 23 of the Complaint and denies liability.

24.    The failure to provide the foregoing warnings, in both content and in a manner which instilled urgency, bolstered a false sense of the X26 CEWs universal safety. The Police Officer who used the X26 CEW on Mr. Faltesek on April 13, 2012 disregarded the risk to Mr. Faltesek's life, because the warnings he was given didn't guide him to use caution in deploying his weapon. He disregarded the risk to Mr. Faltesek's life, because he was not adequately warned that the use of the X26 CEW could lead to injuries that cause sudden death. These inadequate warnings were a producing cause to Mr. Faltesek's death.

**ANSWER:**  TASER denies generally and specifically the allegations contained in paragraph 24 of the Complaint and denies liability.

25.    The unreasonably dangerous condition created by the inadequate warnings was realized on April 13, 2012, when the Houston Police Officer used the X26

CEW on Mr. Faltesek was merely a mentally ill person under the influence of too much prescribed medication, who was in need of medical care and transport to a hospital. The X26 CEW caused the death of Mr. Faltesek when at least six (6) charges were applied to him and he died within minutes.

**ANSWER:** TASER denies generally and specifically the allegations contained in paragraph 25 of the Complaint and denies liability.

## VII. WRONGFUL DEATH DAMAGES [alleged]

26.     Plaintiffs Hazel Faltesek, Individually, and as representative of the estate of Joe Frank Faltesek, and Mary Heinlen, as the Next Friend of JSF, Minor, and as Heir of the Estate of Joe Frank Faltesek, deceased, respectfully request the following damages to be considered separately and individually for the purpose of determining the sum of money that will fairly and reasonably compensate them:

> a.  Plaintiffs pecuniary loss from the death of Joe Frank Faltesek, including loss of care, maintenance, support, services, advice, counsel and contributions of pecuniary value that they would, in all reasonable probability, have received from Joe Frank Faltesek during their lifetime had he lived;
>
> b.  The mental anguish, grief and sorrow Plaintiffs suffered in the past and will continue to suffer in the future as a result of Joe Frank Faltesek's death;
>
> c.  Plaintiffs' damage to their parental relationships with their son and father, including the right to love, affection. Solace, comfort, companionship, society, emotional support and happiness;
>
> d.  Plaintiffs' loss of monetary support due to the death of Joe Frank Faltesek they would, in all reasonable probability, have received from Joe Frank Faltesek during his lifetime had he lived; and
>
> e.  Attorney's fees and court costs.

**ANSWER:** TASER denies that Plaintiffs have sustained any alleged damages

caused or contributed to by TASER, TASER denies that Plaintiffs are entitled to any damages or other relief, and TASER denies liability.

## VIII. SURVIVAL DAMAGES [alleged]

27.    Plaintiffs Hazel Faltesek and Mary Heinlen, as the Next Friend of JSF, Minor, and Heir of the Estate of Joe Frank Faltesek, deceased, respectfully request the following g damages to be considered separately and individually  for the purpose of determining the sum of money that will fairly and reasonably compensate the heir, legal representative and estate:

> a.  The physical pain and suffering Joe Frank Faltesek suffered prior to his death as a result of his injuries sustained from Defendant;
>
> b.  The mental anguish Joe Frank Faltesek suffered prior to his death as a result of his physical injuries sustained from Defendant;
>
> c.  The funeral and cremation and burial expenses incurred as a result of Joe Frank Faltesek's death;
>
> e.  Attorney's fees and court costs.

**ANSWER:**  TASER denies that Plaintiffs have sustained any alleged damages caused or contributed to by TASER, TASER denies that Plaintiffs are entitled to any damages or other relief, and TASER denies liability.

## IX.  EXEMPLARY DAMAGES [alleged]

28.    Defendant's conduct, when viewed from the standpoint of the actors at the time of the occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. Furthermore, Defendant's conduct illustrates not only an attitude of conscious indifference for the rights, safety and welfare of others, but also shows Defendant's actual and subjective awareness of the dangers of such conduct.

**ANSWER:**  TASER denies generally and specifically the allegations contained in paragraph 28 of the Complaint.  TASER further denies that Plaintiffs are entitled to

any alleged damages or relief, and TASER denies liability.

29.     Nevertheless, Defendant proceeded with conscious indifference to the rights, safety or welfare of others, including Plaintiffs. Therefore, Defendant is liable for exemplary/ punitive damages.

**ANSWER:** TASER denies generally and specifically the allegations contained in paragraph 29 of the Complaint. TASER further denies that Plaintiffs are entitled to any alleged damages or relief, and TASER denies liability.

## X. CONDITIONS PRECEDENT [alleged]

30.     All conditions precedent have been performed or have occurred as required by Federal Rule of Civil Procedure 9(c).

**ANSWER:** TASER states that the allegations in paragraph 30 of the Complaint contain legal conclusions, to which no response is required. However, to the extent that a response is required, TASER lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 30 of the Complaint and, therefore, those allegations are in effect denied in their entirety.

## XI. JURY DEMAND

31.     Plaintiffs demand a trial by jury on all issues.

**ANSWER:** TASER admits that Plaintiff demands a trial by jury on all issues, and TASER hereby demands a trial by jury of all issues so triable.

## XII. PRAYER

32.     For the above reasons, Plaintiffs pray they have judgments against Defendant, with interest on the judgment at the legal rate, pre-judgment interest, costs of court and for such other relief, both in law and equity, to which Plaintiffs may show themselves justly entitled.

**ANSWER:** TASER denies that Plaintiffs are entitled to any relief and TASER denies liability.

## GENERAL DENIAL AND AFFIRMATIVE DEFENSES

To the extent TASER failed to specifically respond to any allegation by Plaintiffs in their Complaint, TASER hereby denies the same and denies liability.

As and for its affirmative defenses, and in order that TASER does not waive them, TASER alleges, upon information and belief, the following affirmative defenses, which are pled in the alternative to the extent necessary:

1.      Plaintiffs' Complaint fails to state facts sufficient to constitute any cause of action against TASER.

2.      Plaintiffs cannot meet the burden of proof as to the claims alleged in the Complaint.

3.      Any damages suffered by Plaintiffs were not proximately or legally caused by, or resulting from, conduct of TASER or its products.

4.      The injuries, losses, and/or damages complained of by Plaintiffs, resulted from the new and independent, intervening and superseding act of another person(s), or event, whether named herein or not, which was the direct and proximate cause of any such damages, losses, and/or injuries, if any, complained of by Plaintiffs.  TASER had no control over the actions taken by law enforcement toward decedent, and any alleged injuries suffered by Plaintiffs arise directly out of independent conduct of third parties over whom TASER had no control and with respect to whom it had no legal responsibility or liability.  By reason of the intervening acts or events, TASER's liability, if any, is limited or otherwise barred.

5.      If Plaintiffs suffered or sustained any loss, injury, damage or detriment, the same were directly and proximately caused and contributed to by the strict liability, conduct, acts, omissions, activities, carelessness, recklessness, negligence, fraud, breach of obligations, responsibility, and/or intentional misconduct of the Plaintiffs, the decedent or others beyond TASER's supervision

and control, thereby completely or partially barring Plaintiffs' recovery.

6.    Plaintiffs' damages were caused, in whole or in part, by the comparative or contributory fault of the Plaintiffs, the decedent and/or other persons or entities for whose conduct TASER is not legally responsible.

7.    Plaintiffs and the decedent failed to mitigate the damages, if any, which were sustained, and to exercise reasonable care to avoid the consequences of harms, if any, in that, among other things, Plaintiffs and the decedent failed to use reasonable diligence in caring for any injuries, failed to use reasonable means to prevent aggravation of any injuries and failed to take reasonable precautions to reduce any injuries and damages.

8.    Any injury to Plaintiffs or the decedent were the consequence of pre-existing medical or physical conditions.

9.    To the extent that Plaintiffs and the decedent suffered any detriment, such detriment was unavoidable.  The damages sustained by Plaintiffs and the decedent, if any, were the result of an unavoidable accident insofar as TASER is concerned, and occurred without any negligence, want of care, default, or other breach of duty to Plaintiffs or the decedent on the part of TASER.

10.    Any alleged injuries, to the extent they are found to be wholly or partially attributable to the product or products of TASER, which is expressly denied by TASER, were the direct and proximate result of an idiosyncratic reaction which was not reasonably foreseeable by TASER, and which was not the result of any conduct or negligence on the part of TASER, nor the result of any defect in any warnings or product manufactured or distributed by TASER.

11.    There is no causal connection between injuries allegedly suffered by the Plaintiffs or the decedent and any action or inaction of TASER.

12.    The products alleged in the Complaint were not defective and there was no defect in the product or warnings for the product at the time that it left the

possession of TASER.

13.     TASER provided appropriate, adequate and sufficient warnings and instructions regarding the use of its product.

14.     TASER owed no duty to warn, including under the learned intermediary/purchaser and sophisticated user doctrines.

15.     Any further warning by TASER could not have been effective in lessening the risk of personal injury to the Plaintiffs or the decedent.

16.     Any warning or instructions given by TASER were adequate to avoid injury to person(s) or property from any inherent dangers of the products alleged in the Complaint.

17.     TASER is informed and believes and therefore alleges that no additional warnings were necessary, and/or that no additional warnings would have, or could have, prevented the subject incident, injuries, damages and/or losses as alleged in the Complaint.  TASER's warnings in effect at the time of the incident alleged in the Complaint contained, but were not limited to the following:

a.     "Can cause death or serious injury."

b.     "Resistance to law enforcement interaction often incurs substantial risk of death or serious injury and subjects who resist law enforcement assume all such risks of death or serious injury."

c.     "When lawfully used as directed, ECDs are designed in probe-deployment mode to temporarily incapacitate a person from a safer distance than some other force options, while reducing the likelihood of death or serious injury.  Any use of force or physical exertion involves risks that a person may get hurt or die."

d.     **"Minimize Repeated, Continuous, or Simultaneous Exposures.** Reasonable efforts should be made to minimize the number of ECD exposures.  ECD users should use the lowest number of ECD exposures that

16

are objectively reasonable to accomplish lawful objectives and should reassess the subject's behaviors, reactions, and resistance level before initiating or continuing the exposure."

e.     **"Control and Restrain Immediately.**  Begin control and restraint procedures, including restraining the subject during ECD exposure, as soon as reasonably safe and practical to do so in order to minimize total ECD exposure.  The ECD user, and those individuals assisting the user, should avoid touching the probes, wires, and the area between the probes to avoid accidental or unintended shock during ECD electrical discharge."

f.     **"Physiologic or Metabolic Effects.**   The ECD can produce physiologic or metabolic effects which include, but are not limited to, changes in: acidosis; adrenergic states; blood chemistry, blood pressure; calcium, creatine kinase ("CK"); electrolytes (including potassium); lactic acid; myoglobin; pH; respiration; heart rate, rhythm, capture; stress hormones or other biochemical neuromodulators (*e.g.*, catecholamines). Therefore, reasonable efforts should be made to minimize the number of ECD exposures and resulting physiologic and metabolic effects.  In human studies of electrical discharge from a single ECD of up to 15 seconds, the effects on acidosis, CK, electrolytes, stress hormones, and vital signs have been comparable to or less than changes expected from physical exertion similar to struggling, resistance, fighting, fleeing, or from the application of some other force tools or techniques.  Adverse physiologic or metabolic effects may increase risk of death or serious injury."

g.     **"Physiologically or Metabolically Compromised Persons.**  Law enforcement personnel are called upon to deal with individuals in crisis who are often physiologically or metabolically compromised and may be susceptible to arrest-related death ("ARD").  The factors that may increase

susceptibility for an ARD have not been fully characterized but may include: a hypersympathetic state, autonomic dysregulation, capture myopathy, hyperthermia, altered electrolytes, severe acidosis, cardiac arrest, drug or alcohol effects (toxic withdrawal or sensitization to arrhythmias), alterations in brain function (agitated or excited delirium), cardiac disease, pulmonary disease, sickle cell disease, and other pathologic conditions. These risks may exist prior to, during, or after law enforcement intervention or ECD use, and the subject may already be at risk of death or serious injury as a result of pre-existing conditions, individual susceptibility, or other factors. In a physiologically or metabolically compromised person any physiologic or metabolic change may cause or contribute to death or serious injury. Follow your agency's Guidance when dealing with physiologically or metabolically compromised persons."

h.      **"Higher Risk Populations.** ECD use on a pregnant, infirm, elderly, small child, or low body-mass index ("BMI") person could increase the risk of death or serious injury. ECD use has not been scientifically tested on these populations. The ECD should not be used on members of these populations unless the situation justifies possible higher risk of death or serious injury."

i.      **"Sensitive Body Part Hazard.** When possible, avoid intentionally targeting the ECD on sensitive areas of the body such as the head, throat, chest/breast, or known pre-existing injury areas without legal justification. The preferred target areas are below the neck area for back shots and the lower center mass (below chest) for front shots. The preferred target areas increase dart-to-heart safety margin distance."

18.     TASER would show that, on information and belief, Plaintiff's claims are barred, in whole or in part, because the sole proximate or producing

cause or, in the alternative, a proximate or producing cause of any alleged damages made the basis of this lawsuit was the failure to follow instructions, by one or more other parties, responsible third parties, and/or third parties over which TASER has no control or legal responsibility, for any TASER products made the basis of Plaintiffs' claims, which is pled in bar or diminution to any recovery, if any, herein by Plaintiffs.

19.     TASER requests that in accordance with TEX. CIV. PRAC. & REM. CODE § 33.003 the jury determine the percentage of responsibility for causing in any way the harm for which recovery of damages is sought by the Plaintiffs, Plaintiffs' decedent, each settling person, and each responsible third party who has been designated under TEX. CIV. PRAC. & REM. CODE § 33.004.  TASER specifically asserts that any alleged fault or liability of TASER, which is otherwise denied, should be compared to the responsibility of all "claimants," "defendants," "settling persons" and/or "responsible third parties," and any recovery against TASER, if any, should be reduced or barred pursuant to Chapter 33 of the Texas Civil Practice and Remedies Code.

20.     TASER alleges that Plaintiffs may not recover any amount of damages if the percentage of responsibility of Plaintiffs' decedent is greater than fifty percent (50%), regardless of the theory of recovery pled.  TEX. CIV. PRAC. & REM. CODE § 33.001.

21.     TASER alleges that, in accordance with Section 33.013 of the Texas Civil Practice & Remedies Code, TASER may not be held jointly and severally liable for any amount of damages claimed herein unless the percentage of responsibility of TASER, when compared with that of each responsible party, each settling person, and each responsible third party, is greater than fifty percent (50%).

22.     TASER requests that in the event at the time of submission Plaintiffs seek recovery for loss of earnings, loss of earning capacity, loss of contributions of a pecuniary value, or loss of inheritance, then in accordance with the statutory requirements imposed by TEX. CIV. PRAC. & REM. CODE §18.091, the Court "instruct the jury as to whether any recovery for compensatory damages sought by the claimant is subject to federal or state income taxes."

23.     TASER alleges that Plaintiffs' recovery of medical or health care expenses incurred be limited to the amount actually paid or incurred by or on behalf of the Plaintiffs or Plaintiffs' decedent.  TEX. CIV. PRAC. & REM. CODE § 41.0105.

24.     Any product manufactured by TASER was not defective in design due to inherent characteristics of the product which is a generic aspect of the product which cannot be eliminated without substantially compromising the product's usefulness or desirability and which is recognized by the ordinary person with the ordinary knowledge common to the community.

25.     TASER would show that Plaintiffs' proof with respect to all "design defect" allegations is governed by statute.  TEX. CIV. PRAC. & REM. CODE § 82.005.  Plaintiffs must prove by a preponderance of the evidence (1) there was a "safer alternative design," as that term is statutorily defined, and (2) the defect was a producing cause of the damage for which the claimants seek recovery.  TASER asserts its entitlement to have the jury instructed on all statutorily required elements of a "design defect" case.

26.     The product in question was reasonably safe for its intended use as manufactured and designed when it left the possession of the manufacturer.

27.     Any TASER products at issue are state-of-the-art and were state-of-the-art in the industry when they left TASER's control.

28.    TASER would show that at the time any TASER products at issue left TASER's control, such product met or exceeded all government and/or other industry standards that were applicable to the product at the time of manufacture and sale and that governed the product risk that allegedly caused harm.  As such, TASER is entitled to a presumption under TEX. CIV. PRAC. & REM. CODE § 82.008 that it is not liable for Plaintiff's claims.

29.    TASER did not breach any duty owed by it to the Plaintiffs or the decedent.

30.    TASER did not make any intentional or negligent misrepresentations regarding TASER's products.

31.    TASER denies that Plaintiffs or the decedent sustained any injury, damage, or loss, if any, by reason of any act or omission on the part of TASER, or any agent, servant, or employee of TASER.

32.    The events and damages alleged in the Complaint were open, obvious, and known to the Plaintiffs and the decedent, and therefore Plaintiffs and the decedent assumed the risk of any perils or damages to which the Plaintiffs and the decedent knowingly exposed themselves.   Such negligence and careless conduct was the sole proximate or producing cause or, alternatively a proximate or producing cause of any and all damages and injuries alleged in the Complaint and any recover against TASER is therefore barred or diminished.

33.    There was no obligation on TASER to warn in that the alleged dangerous propensity was obvious and or known at the time the product was being used.

34.    TASER did not have, at all times relevant to the Complaint, actual or constructive knowledge of the alleged danger or risk inherent in the use of the products as alleged in the Complaint.

35.    The particular risks alleged in the Complaint were either unknown

21

nor should have been known by TASER and TASER was therefore under no duty to warn Plaintiffs, the decedent or law enforcement of any such risks as alleged in the Complaint.

36.     The risks of the subject product are outweighed by its benefits in that any alternate design would entail unreasonable cost, be uneconomic or impractical, interfere with the product's performance, or create other or increased risks.

37.     Subject to further investigation and discovery, any purported defects in the products alleged in the Complaint were caused by alteration and/or modification of the product after its purchase.

38.     Recovery against TASER is barred to the extent anyone failed to use the allegedly defective product in its intended manner or in a reasonable manner.

39.     Subject to further investigation and discovery, any purported defects in the products alleged in the Complaint resulted from unforeseeable misuse of the product by third parties.

40.     To the extent the product was being used in a reasonable manner appropriate to the purpose for which it was intended, recovery against TASER is barred.

41.     In the unlikely event any TASER is held liable for any amounts to Plaintiffs, any such amounts must be offset by or against any amount recovered by Plaintiffs from any other responsible parties.  Plaintiffs' claims are barred to the extent of any credit or offset for any and all sums that Plaintiff(s) have received or may hereafter receive by way of any and all settlements arising from this incident or Plaintiffs' claims and causes of action against others.

42.     To the extent there was any administrative review, agency action or similar action taken regarding the events described by Plaintiffs, TASER may be entitled to use such findings as either *res judicata* or collateral estoppel,

precluding Plaintiffs from any recovery.

43.     To the extent any settlement was or is reached with Plaintiffs and any third-party, or award given, whether by a tribunal, arbitration, agreement or otherwise, such constitutes accord and satisfaction which TASER is entitled to raise, so as to bar Plaintiffs from recovery.

44.     Any claims against TASER are barred, in whole or in part, by virtue of Plaintiffs having waived their right to bring the claims.

45.     To the extent that punitive damages are alleged against TASER, the imposition of punitive damages under Texas law violates the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and Article I, sections 13 and 19 of the Texas Constitution.

46.     Plaintiff may not be awarded exemplary damages unless she establishes by clear and convincing evidence that TASER acted with gross negligence, which TASER denies.  TEX. CIV. PRAC. & REM. CODE § 41.003.

47.     TASER insists that in the unlikely event any claim for recovery of punitive damages is submitted to the jury, that in accordance with Tex. Civ. Prac. & Rem. Code § 41.003(d) and (3), the Charge of the Court instruct the jury that any finding of "liability for any amount of exemplary damages" must be unanimous.

48.     In the unlikely event of any exemplary damage award, TASER further invokes the provisions of TEX. CIV. PRAC. & REM. CODE § 41.008 limiting any award of exemplary damages to either $200,000 or two times the amount of "economic damages," as defined by statute, plus an amount equal to any non-economic damages found by the jury, but not to exceed $750,000.

49.     Subject to further investigation and discovery, Plaintiffs lack standing to assert their claims and, in particular, Plaintiff HAZEL FALTESEK, as the decedent's parent, has no standing to recover and is not entitled to recover

exemplary or punitive damages under the Texas Constitution.

## RESERVATION OF ADDITIONAL DEFENSES

TASER reserves the right to plead as additional affirmative defenses, any of the items set forth in the Federal Rules of Civil Procedure, Texas statutes and laws, and any other matter constituting an avoidance or affirmative defense as the same may be revealed during disclosure and/or discovery proceedings in this matter.

WHEREFORE, TASER demands judgment dismissing the Complaint and decreeing that Plaintiffs take nothing by it, awarding TASER its costs, attorneys' fees, and other and further relief as may be just and proper under the circumstances.

Respectfully Submitted,

**BEIRNE, MAYNARD & PARSONS, L.L.P.**

By: /s/ *Roger L. McCleary*
    **Roger L. McCleary**
    Texas Bar No. 13393700
    Federal ID No. 205
    1300 Post Oak Blvd., Suite 2500
    Houston, Texas 77056-3000
    Telephone: (713) 623-0887
    Facsimile: (713) 960-1527
    rmccleary@bmpllp.com
    **ATTORNEY-IN-CHARGE FOR**
    **DEFENDANT TASER INTERNATIONAL, INC.**

OF COUNSEL:
**Meagan W. Glover**
(Formerly Meagan P. Wilder)
Texas Bar No. 24076769
Federal ID No. 1550940

1300 Post Oak Blvd., Suite 2500
Houston, Texas 77056
(713) 623-0887 (Tel.)
(713) 960-1527 (Fax)
mwilder@bmpllp.com

**Isaiah Fields,** *Pro Hac Vice*
Arizona Bar No. 024640
TASER International, Inc.
17800 North 85th Street
Scottsdale, Arizona 85255
(480) 502-6280 (Tel.)
(480) 905-2027 (Fax)
isaiah@taser.com

**Michael A. Brave,** *Pro Hac Vice*
Wisconsin Bar No. 1012226
TASER International, Inc.
17800 North 85th Street
Scottsdale, Arizona 85255
(480) 502-6280 (Tel.)
(480) 905-2027 (Fax)
brave@taser.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing was electronically served through the Courts ECF system, in accordance with the Federal Rules of Civil Procedure, upon Plaintiffs' counsel of record on the 11th day of July, 2014.

Walter A. Medsger
4302 North Cook Circle
League City, Texas 77573
*Attorney for Plaintiffs*

*/s/ Roger L. McCleary*
Roger L. McCleary

2011039v.1 IMANAGE 107197

26